## SCHŒFFLER VS. SCHWARTING.

Upon the evidence in this case and the admissions of the complaint, this court are of opinion that the circuit court erred in finding that there was no copartnership between the plaintiff and the defendant's intestate, during the lifetime of the latter; and in adjudging that a note and chattel mortgage executed by the plaintiff in consideration of the dissolution of a supposed partnership of that character, be delivered up and cancelled.

APPEAL from the Circuit Court for *Milwaukee* County.

The decision of this court on an appeal from an order of the circuit court refusing to dissolve an injunctional order obtained by the plaintiff in this action, will be found *ante*, p. 30. The pleadings are there sufficiently stated.   After the cause was remitted to the circuit court, the issue made by the pleadings came on for trial.   The plaintiff proved that he was sole proprietor of the Wisconsin Banner printing establishment up to March, 1851, about which time Wendte became connected with the office.   Thomas Lorenzen, as a witness for the plaintiff, was asked, "Did you ever have any conversation with Wendte as to the terms upon which he went into the Banner office?   If so, state what that conversation was."   Objection

made, and overruled. *Answer:* "I had a conversation with Wendte shortly after the name of Schœffler & Wendte appeared in the paper as publishers. Being a particular friend of Wendte, I expressed my surprise that, knowing that he had no means, he had become a partner in that concern. He answered that he was really no partner of *Mr. Schœffler*, but was only employed at a certain salary to keep his books and manage the affairs of the concern. He also stated that he had loaned *Mr. Schœffler* a certain sum of money (about $200) for which he, *Schœffler*, was to pay him a certain rate of interest. I think he said it was a note he had loaned *Schœffler*. He stated to me that he was not a partner of *Schœffler's;* this was in 1851, not more than a day or two after his name appeared in the paper." On cross-examination the witness testified: "This conversation took place either at Wendte's house or in a saloon on Market Square, kept by Upman. I can't say who was present at the conversation; can't say what time of day, whether in the morning or evening; I don't know what kind of weather there was at the time; I don't know whether there was snow on the ground. I was a broker then as I am now. The conversation occurred accidentally; I never repeated it to any one but Mr. S. Park Coon this morning. I don't pretend to state the words used, I only give the substance of them; I expressed my surprise, and said his friends were surprised that he became a partner there, when it was notorious he had no means; he had failed in business."

The deposition of August Kreuer was read in evidence as follows: "I was employed in the office of the "Wisconsin Banner" as editor from the 16th or 20th of November, 1851, to January 1st, 1854; Wendte was in the establishment during that whole time." *Question:* "Who employed you as editor?" *Answer:* "Rudolph Wendte came to me at New York where I was editor of the Staats Zeitung, on the 3d of November, 1851. He told me that they needed an editor for their paper; they had written to me before, and I concluded to be their ed-

itor, so I came here with Mr. Wendte to Milwaukee, I believe on the 16th of November, 1851." *Question:* "Did you have any and what conversation with Mr. Wendte as to the relation that existed between him and *Mr. Schœffler?*" Objection made, and overruled. *Answer:* "Very often. At the time when I came here with Wendte, *Mr. Schœffler* was register of deeds, and Mr. Wendte had to keep the books. Wendte .told me that *Schœffler* took him, Wendte, in to keep the books, and that he also made him a partner so that he would become more interested in the business; that he expected to get some money from his father-in-law, who lived in Veren, kingdom of Hanover, and he would put that money into the partnership to enlarge the paper and give it greater circulation. Wendte told me that when he paid that money in he would be in full partnership with *Mr. Schœffler.* He told me that he expected to get some interest in the office when he got the money, and he also said that he had a small amount of money when he left the tobacco business, but whether it was put into that partnership or not, I do not know; I do not recollect whether he stated the amount or not; it was a very small sum. *Mr. Schœffler* told Mr. Wendte, on several occasions during the time I was editor of the paper, in my presence, that he, *Schœffler,* was proprietor of the whole establishment, and this was said when Wendte was not attending to the books, going round in saloons, &c., and *Mr. Schœffler* would tell him he ought to give more attention to the business. Wendte promised to do better." *Question:* "Did Wendte ever tell you what wages or pay he was to receive?" Objection made, and overruled. *Answer:* "He told me that he could not take out more than six dollars a week. *Schœffler* first wrote me about employing me, and Mr. Wendte, when he employed me at New York, telegraphed *Mr. Schœffler* that he had employed me, and Mr. Wendte told me *Mr. Schœffler* had telegraphed back assenting to the employment. During the time I was here I received directions from *Mr. Schœffler* exclusively. I was employed as

Schœffler vs. Schwarting.

an independent editor, but not understanding the politics here, *Mr. Schœffler* gave me directions. I got my pay from both *Mr. Schœffler* and Mr. Wendte. Mr. Wendte never referred me to *Mr. Schœffler* when I wanted money. Some times when he had not money he would refer me to *Mr. Schœffler* to get it. It was part of Mr. Wendte's duty to pay the hands as well as keep the books." On cross-examination, the witness testified: "During all the time I was there, the business and paper were conducted under the firm name of Schœffler & Wendte. Mr. Wendte attended to the books and financial part of the business; *Mr. Schœffler* attended to the whole business and supervised it; Mr. Wendte did nothing in the matter of the editing of the paper; he was the financial man and attended to the keeping of the books; I was the chief editor of the paper; I received directions as to Wisconsin politics from *Mr. Schœffler*, as I did not at first understand them; we counseled together, and when *Mr. Schœffler* wrote anything he first showed it to me; *Mr. Schœffler* was register of deeds over a year while I was here; he came to the newspaper office each morning and afternoon; I do not know what has become of the letter *Mr. Schœffler* wrote to me asking me to become editor; it was signed ' *Moritz Schœffler* ; ' I did not know *Mr. Schœffler* before then. I resided in Madison from January, 1854, to April, 1859 ; from the first of January, 1854, to January, 1857, I saw the 'Banner and Volksfreund' almost daily, and wrote for it, and was paid therefor by *Mr. Schœffler* ; the paper during that time was conducted in the name of *Moritz Schœffler* and Rudolph Wendte; the names of the proprietors on the top of the paper were 'Schœffler & Wendte, publishers ; ' *Mr. Schœffler* paid me for the articles I wrote both here and at Madison, just as it happened."

The plaintiff further proved by the records of the probate court of Milwaukee county, that the defendant was duly appointed administrator of the estate of said Wendte in February, 1857; that no inventory or appraisal of the es-

tate was filed as required by statute until February, 1861; that the inventory then filed is correctly described in the complaint, and contained a list of printing materials and printing office furniture only, as set forth in a schedule attached to the complaint; and that no license had ever been granted to the defendant to sell or in any manner dispose of the estate of the deceased. The plaintiff then rested; and no evidence was introduced on the part of the defendant. The court found as facts that there was no partnership between the plaintiff and said Wendte during the life time of the latter; and that the notes and chattel mortgage described in the complaint were made and delivered in consideration of the pretended dissolution of a supposed copartnership which did not exist, and were therefore without consideration. And as a conclusion of law, he found that said notes and chattel mortgage were void and ought to be delvered up and cancelled; and judgment was rendered accordingly. The defendant filed exceptions to the findings, and appealed from the judgment.

*Jas. G. Jenkins*, for appellant:

To entitle the plaintiff to the relief sought upon the ground that he was misled by the misrepresentations of the defendant and his attorney, those misrepresentations must have been fraudulent; they must have been concerning something in regard to which he placed a known trust or confidence in them, and something which was peculiarly within their knowledge; must have been of facts, and certain; the plaintiff must have been misled by them; and the fraud must be clearly proven. 1 Story's Eq., §§ 190, 200 a; 2 Smith's L. C., 132; *Ward v. Center*, 3 Johns., 271, 280; *Allen v. Addington*, 7 Wend., 10; *Starr v. Bennett*, 5 Hill, 303; *Clark v. White*, 12 Peters, 178. The *onus probandi* rests upon the plaintiff. Cowen & H.'s Notes, 301, 484: *Fleming v. Slocum*, 18 Johns., 403. Courts cannot interfere with contracts when any part of the foundation for relief rests upon conjecture or mere probability of

fact, but the whole must be cleared of all reasonable doubt, and must be sustained by solid and convincing testimony. *Lake vs. Meacham,* 13 Wis., 362 ; *Fowler vs. Adams,* id., 458. There was no proof at the trial of any representations whatever. There was, however, proof furnished by the plaintiff's own witness Kreuer, that a partnership in fact existed. There is no proof that Wendte did not procure the money of which he spoke to Kreuer, and invest it in the concern. On the contrary it appears that in April, 1855, the material and stock of the " Volksfreund " was purchased, and the two papers consolidated. Upon such evidence as this, and the facts admitted by the complaint, can the court be seriously invoked to set aside the contract ?

*William T. Butler,* for respondent, contended that the evidence showed clearly that the plaintiff owned the printing establishment in his individual name up to the time when Wendte's name appeared in the columns of the paper ; that the testimony of Thomas Lorenzen and August Kreuer was conclusive that there was no co-partnership entered into at the time referred to in that testimony, which was subsequent to such appearance of Wendte's name ; that those witnesses were uncontradicted as to the facts sworn to by them ; and that the plaintiff having shown the truth of his most material allegations, the *onus probandi* as to the contrary allegations of the answer, rested upon the defendant.

*By the Court,* COLE J. This case presents substantially the same questions of law and fact as when it was before us on a former appeal. We then indicated our views in regard to matters stated in the complaint, and declared, in effect, that upon the record as it then stood we had no doubt that a partnership existed between the respondent and Wendte in publishing a German newspaper in Milwaukee. We find nothing in the case now to shake or overcome that conclusion. It appears to us that the principles of self-interest and the dic-

tates of prudence and discretion which control the conduct of mankind, would have prevented the respondent from consenting to an inventory of his property as belonging to the estate of Wendte, if the latter really had no interest in the printing establishment, and above all would have prevented him from entering into the written agreement to pay twenty-five hundred dollars for an interest which had no existence, and actually paying several hundred dollars of the purchase money. On the trial, the respondent proved by the testimony of two witnesses some verbal admissions of Wendte to the effect that he was working on a salary. Lorenzen says he had a conversation with Wendte in 1851, not more than a day or two after his name appeared in the paper as one of the proprietors, in which Wendte stated that he was not a partner of *Schœffler*. But this witness says that this was a casual conversation, which took place either at Wendte's house or in a saloon, but he can-not say whether any one was present, nor could he tell the time of day it occurred, or the state of the weather, or wheth-er there was snow upon the ground, nor give any reason or circumstance why he was able, after the lapse of ten or eleven years, to recall the substance of the conversation. The other witness, Kreuer, says that some time in November, 1851, when he came to Milwaukee to edit the Wisconsin Banner, Wendte in a conversation told him that *Schœffler* employed him to keep the books, and that he also made him a partner so that he would become more interested in the business, &c. Now to say that such loose declarations as these are to overcome the effect of the respondent's consenting, some years afterwards, to the interest of one half of the newspaper establishment be-ing inventoried as the property of Wendte, and to the solemn act of *Schœffler* in buying that interest and paying for it in part, is giving them a weight to which they are not entitled. We much rather prefer relying upon the solemn, deliberate acts and admis-sions of *Schœffler* himself. He certainly held Wendte out to the world as his partner: treated with his administrator upon

the basis that Wendte owned one half of the establishment; purchased that interest, and has paid more than a thousand dollars upon the purchase. These written admissions, repeated acts and declarations of *Schœffler* were more deliberately made, and are far more satisfactory as to the nature and extent of Wendte's interest in the property, than anything that the above named witnesses swear to. But we do not feel called upon to dwell upon this case. Nothing has been proven which tends to impeach or destroy the validity of the written contracts entered into by the respondent. We see no reason why they should be cancelled or declared void.

The judgment of the circuit court is reversed, and the cause remanded with directions to dismiss the complaint.